**EARTHINFO, INC., a Colorado corporation, Petitioner,**

v.

**HYDROSPHERE RESOURCE CONSULTANTS, INC., Respondent.**

**No. 94SC39.**

Supreme Court of Colorado, En Banc.

June 30, 1995.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, for petitioner.

Mastbaum & Archer, P.C., David Mastbaum, Arthur H. Travers, Lynn Guissinger, Boulder, for respondent.

Justice SCOTT delivered the Opinion of the Court.

In January 1990, respondent, Hydrosphere Resource Consultants, Inc. (Hydrosphere), filed this action against petitioner, EarthInfo, Inc. (EarthInfo), seeking to rescind the parties' software development contracts due to EarthInfo's failure to make royalty payments. The trial court determined that EarthInfo had breached its contracts with Hydrosphere, ordered the contracts rescinded, and ordered that EarthInfo repay to Hydrosphere all the net profits it realized as a result of its breach. The court of appeals affirmed the trial court.

We granted certiorari to determine (1) whether the court of appeals erred when it concluded that the proper measure of restitution for partial rescission of a contract was disgorgement of the petitioner's profits; and (2) whether the district court erred by not giving credit to the petitioner for that portion of the profits that are attributable to the petitioner's effort and investment. We conclude that net profits realized by EarthInfo as a result of its breach which were not attributable to its own efforts should be returned to Hydrosphere as unjust enrichment. Accordingly, we affirm in part, reverse in part, and return this case to the court of appeals with directions that it remand this matter to the trial court for further proceedings in accordance with this opinion.

I

Between 1986 and 1988, Hydrosphere entered into several contracts with US West, Inc. (US West), a Delaware corporation, to develop a number of products that employ CD–ROM technology[1] (the "Contracts").

1. Five such products were developed: Daily Values, Peak Values, Climate Data, Environment Canada, and Hourly Precipitation Data ("HPD").

Each of these Hydrodata products consisted of computer disks (CD–ROMs), the software that

The products were designed to exploit hydrological and meteorological information collected by government agencies and to make that information available to the general public through Hydrosphere. Under the Contracts, Hydrosphere was to develop the CD–ROM units and create the software that enables end-users to access the otherwise public information on line from the CD–ROM units.

The Contracts vested all rights of ownership, copyrights, and patents in the products to US West. Under the terms of the Contracts, Hydrosphere had an ongoing obligation to provide technical support to end-users of the products, and US West was to create user manuals, and package and market the products. US West was also to pay Hydrosphere a fixed hourly development fee as well as royalties, calculated as a percentage of net sales, for "inventive product ideas." Payments under the Contracts were made on a quarterly basis.

On February 10, 1989, US West assigned its interest in the Contracts to EarthInfo in a leveraged buy-out deal [2] in which EarthInfo agreed to pay US West $60,432.[3] EarthInfo also entered into a separate agreement with Hydrosphere in which it agreed to honor US West's obligations under the Contracts, including the continued payment of royalties on the products already developed by Hydrosphere. EarthInfo fulfilled its contractual obligations through June 30, 1990. Hydrosphere then claimed that sales of a new derivative product were subject to royalty payments; EarthInfo claimed that the Contracts did not address derivative products, and therefore objected to increasing its royalty obligation. On October 30, 1990, when the third-quarter royalty payments were due, EarthInfo informed Hydrosphere that it was withholding these payments and any further royalty payments pending clarification of the basis for the royalty payments. EarthInfo continued to make payments of the fixed hourly development fees. A total of $19,000 in fixed fees was paid to Hydrosphere after June 30, 1990. After strained negotiations, Hydrosphere notified EarthInfo by letter on December 12, 1990, that it was rescinding the Contracts.

On January 11, 1991, Hydrosphere filed a breach of contract action against EarthInfo in the Boulder County District Court. After a four-day trial in March of 1992, the trial court ruled that EarthInfo did not owe royalties on sales of the derivative product, but the court determined that EarthInfo had breached its Contracts with Hydrosphere when it unilaterally suspended royalty payments on the other products. In a subsequent hearing, both parties sought rescission of the Contracts and restitution as a remedy. The trial court found "the breach was substantial" and that "due to the nature of the contracts between the parties and the depth of their disputes, damages would be inadequate." The trial court determined that the appropriate remedy would be rescission. In an order and judgment issued two days later it set June 30, 1990, the date through which EarthInfo had paid royalties, as the date of rescission.[4]

As restitution between the parties, the court ordered EarthInfo to return to Hydrosphere all tangible property developed under the Contracts. In addition, the court found that "since rescission is an equitable remedy the court has discretion in determining the appropriate relief for the parties," and ordered EarthInfo to return to Hydrosphere all property, promotional materials and proprietary information related to the Hydrodata products. In addition, the court held

allowed the user to read the data on the CD–ROMs, and a user manual.

2. A leveraged buy-out is a transaction for the purchase of a controlling interest in a company that is substantially funded by debt issued by the purchaser.

3. EarthInfo subsequently negotiated the debt owed to US West down to $18,172.80.

4. Both parties argued for different dates of rescission. Hydrosphere suggested, and EarthInfo tacitly agreed, that February 10, 1989, the date EarthInfo acquired its interest in the Contracts, would be the most convenient date of rescission. The court found, however, that this date had no logical relation to the breach and chose June 30, 1990, the date of the breach itself, as the date of rescission. Since the date of rescission is not before us, we express no opinion as to which date should apply.

EarthInfo responsible in equity "for the repayment to Hydrosphere of the net profits realized by EarthInfo" from June 30, 1990, until the date of the order, totaling $265,-204.91. The court found Hydrosphere "in equity responsible for the repayment to EarthInfo of amounts paid by EarthInfo" in acquiring the Hydrodata product line from US West, totalling $60,432, and in fixed hourly development fees paid by EarthInfo after June 30, 1990, in the amount of $19,000. The costs incurred by EarthInfo were deducted from the net profits, resulting in a judgment in favor of Hydrosphere in the amount of $185,772.91.

EarthInfo appealed the judgment of the trial court, seeking a return of the tangible property that it had delivered to Hydrosphere pursuant to the trial court's order.[5] EarthInfo also alleged that the trial court abused its discretion in awarding Hydrosphere all of the net profits EarthInfo had realized since June 30, 1990.

The court of appeals affirmed the judgment of the trial court in an unpublished opinion. The majority held that it was within the trial court's discretion to consider the net profit realized by a party in setting the amount of restitution. Judge Rothenberg, in her dissent, stated that disgorgement of profits in this case is not supported by Colorado case law, and that the case should be reversed and remanded on this issue alone.

We granted certiorari review of the appropriateness of disgorgement of profits as a measure of restitution, and the calculation or apportionment of those profits by the trial court.

## II

This case presents a question of first impression for this court: whether a party that breaches a contract can be required to disgorge to the non-breaching party any benefits received as a result of the breach. Because this issue has remained largely unexplored, the rules of application are neither settled nor uniform. The difficulty in resolving this issue stems from a subtle conflict between the law of restitution and the law of contracts. This conflict is well articulated in what has become a leading article on the disgorgement principle:

> It is a principle of the law of restitution that one should not gain by one's own wrong; it is a principle of the law of contracts that damages for breach should be based on the injured party's lost expectation. In many cases, the principles are mutually consistent. If, on breach, the injured party's lost expectation equals or exceeds the gain by the party in breach, then damages based on expectation strip the party in breach of all gain, and make the injured party whole. But if the injured party's lost expectation is less than the gain realized by the party in breach, then damages based on expectation do not strip the party in breach of all gain. This situation brings the two principles into conflict.

E. Allan Farnsworth, *Your Loss or My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract,* 94 Yale L.J. 1339, 1341 (1985) [hereinafter "Farnsworth"] (citations omitted). According to Farnsworth, courts have been reluctant to award profits to a nonbreaching party in a breach of contract action, thus allowing the party in breach to keep part of the gain, since in effect "a 'mere' breach of contract is not a 'wrong.'" Farnsworth at 1341. Many others, however, have suggested that if the gain realized by the party in breach exceeds the injured party's loss, the measure of damages should strip the party in breach of all gain.[6]

---

**5.** EarthInfo filed a petition for bankruptcy on June 2, 1992, and no longer seeks the property which was returned to Hydrosphere.

**6.** For books and articles advocating the disgorgement principle, see Robert Goff and Gareth Jones, *The Law of Restitution* 490 (2d ed. 1978); George E. Palmer, *The Law of Restitution* (1978); J.C. Shepherd, *The Law of Fiduciaries* (1981); John Dawson, *Restitution or Damages?,* 20 Ohio St.L.J. 175 (1959); Daniel Friedmann, *Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong,* 80 Colum.L.Rev. 504 (1980); Duncan Kennedy, *Form and Substance in Private Law Adjudication,* 89 Harv.L.Rev. 1685, 1717, 1734 (1976); Roberto Unger, *The Critical Legal Studies Movement,* 96 Harv.L.Rev. 561, 641 (1983).

We adopt neither approach as a general rule, and hold instead that whether profits are awarded to a nonbreaching party shall be determined within the discretion of the trial court on a case by case basis.

## A

Rescission of a contract may be granted if the facts show a substantial breach, that the injury caused by the breach is irreparable, and that damages are inadequate, difficult or impossible to assess. *See Wall v. Foster Petroleum Corp.*, 791 P.2d 1148, 1150 (Colo.App.1989), *cert. denied*, No. 89SC682 (Colo. May 14, 1990); *Ralston Oil and Gas Co. v. July Corp.*, 719 P.2d 334, 339 (Colo.App.1985). A contract can also be rescinded by the "mutual consent" or "actions" of the parties. *See Rice v. Hilty*, 38 Colo. App. 338, 340, 559 P.2d 725, 726 (1976).

Here, the trial court found not only that EarthInfo's breach was substantial, but that "due to the nature of the contracts between the parties and the depth of their disputes, damages would be inadequate." The trial court also found that although the Contracts "contemplate an ongoing relationship" between the parties, "[i]t is unrealistic to assume that damages could be computed and awarded and that the parties could then resume that relationship in a productive manner." The trial court found further that both parties sought rescission of the Contracts. Thus, the trial court concluded that

rescission was necessary.[7] Since evidence in the record supports the trial court's findings, we conclude that rescission of the Contracts was warranted.

Rescission of a contract normally is accompanied by restitution on both sides. 1 Dan B. Dobbs, *Law of Remedies* § 4.3(6) at 614 (2d ed. 1993) [hereinafter "Dobbs"]. The contract is "being unmade, so restoration of benefits received under the contract seems to follow." *Id.* Restitution measures the remedy by the defendant's gain and seeks to force disgorgement of that gain in order "to prevent the defendant's unjust enrichment."[8] *Id.* § 4.1(1) at 552, 557. Restitution, which seeks to prevent unjust enrichment of the defendant, differs in principle from damages, which measure the remedy by the plaintiff's loss and seek to provide compensation for that loss. *Id.* at 555, 557. As a consequence, "in some cases the defendant gains more than the plaintiff loses, so that the two remedies may differ in practice as well as in principle."[9] *Id.* at 555.

A party seeking to rescind a contract must return the opposite party to the *status quo ante*, or the position in which he or she was prior to entering into the contract. *Ralston Oil*, 719 P.2d at 339; *Smith v. Huber*, 666 P.2d 1122, 1124 (Colo.App.1983); *Rice*, 38 Colo.App. at 340, 559 P.2d at 727. The rule of returning the parties to the *sta-*

---

7. The trial court held:
   The court finds not only that the breach was substantial, but that due to the nature of the contracts between the parties and the depth of their disputes, damages would be inadequate. The contracts contemplate an ongoing relationship. It is unrealistic to assume that damages could be computed and awarded and that the parties could then resume that relationship in a productive manner.... Rescission is, therefore, an appropriate remedy.
   The court explained further that "[a] principal reason why a remedy limited to damages is inappropriate is that it would leave the products developed by Hydrosphere in the hands of a hostile and uncooperative EarthInfo, with the latter under a continuing duty to pay royalties, and also with an interest in promoting its own product line."

8. Dobbs cites the following example:
   Suppose a thief takes the plaintiff's $10 watch and sells it for $20. The thief is liable for $20,

as restitution.... The defendant is liable for the $20 because the fund of $20 is perceived as a gain produced by the plaintiff's property. By identifying the $20 as a product of the plaintiff's property, we can think of it as a replacement or substitute for the property. The plaintiff entitled to recover the watch is equally entitled to recover whatever is produced by or substituted for the watch.
Dobbs § 4.1(1) at 554.

9. In the event a defendant's gains in a transaction exceed the plaintiff's losses and the plaintiff recovers the defendant's gains as restitution, the plaintiff will receive a greater reward and will be better off than if he or she were awarded damages for the defendant's breach. Thus, the plaintiff's expectations are exceeded because recovery is not based on the loss in value to the plaintiff, but rather on the benefit to the breaching defendant.

*tus quo ante* is equitable and it requires the use of practicality in the readjustment of the parties' rights. *Huber,* 666 P.2d at 1124. Since rescission is an equitable remedy, it is within the trial court's sound discretion to determine the method for accomplishing a return to the *status quo ante* based upon the facts as determined by the trier of fact. *Id.* at 1124–25; *see also Ralston Oil,* 719 P.2d at 339. All uncertainties as to the amount of benefit are to be resolved against the party committing the material breach. *W.H. Woolley & Co. v. Bear Creek Manors,* 735 P.2d 910 (Colo.App.1986).

The main options for measurement of the benefit conferred on the breaching party are these:

(1) the increased assets in the hands of the defendant from the receipt of property;

(2) the market value of services or intangibles provided to the defendant, without regard to whether the defendant's assets were actually increased; that is, the amount which it would cost to obtain similar services, whether those services prove to be useful or not;

(3) the use value of any benefits received, as measured by (i) market indicators such as rental value or interest or (ii) actual gains to the defendant from using the benefits, such as the gains identified in item (5) below;

(4) the gains realized by the defendant upon sale or transfer of an asset received from the plaintiff;

(5) collateral or secondary profits earned by the defendant by use of an asset received from the plaintiff, or, what is much the same thing, the savings effected by the use of the asset.

Dobbs § 4.1(4) at 566–67 (footnote omitted).[10] It is the fifth option, disgorgement of profits, which is principally at issue in this case.

■ No easy formulas exist for determining when restitution of profits realized by a party is permissible. Instead, the court must resort to general considerations of fairness,

taking into account the nature of the defendant's wrong, the relative extent of his or her contribution, and the feasibility of separating this from the contribution traceable to the plaintiff's interest. 1 George E. Palmer, *The Law of Restitution* § 2.12 at 161 (1978) [hereinafter "Palmer"]. Thus, the more culpable the defendant's behavior, and the more direct the connection between the profits and the wrongdoing, the more likely that the plaintiff can recover all defendant's profits. *See, e.g.,* Douglas Laycock, *The Scope and Significance of Restitution,* 67 Tex.L.Rev. 1277, 1289 (1989). The trial court must ultimately decide whether the whole circumstances of a case point to the conclusion that the defendant's retention of any profit is unjust.

■ Generally, the mere breach of a contract will not make the defendant accountable for benefits thereby obtained, whether through dealings with a third person or otherwise. As noted by Dobbs § 4.1(4) at 566–67:

[t]o require a defendant to give up profits may operate with particular severity because at least some of the profits would almost always be attributable to the defendant's efforts or investment. So the profit recovery as a measure of restitution is extraordinary. In general, the defendant who is not a serious wrongdoer is held only to make restitution measured by actual gains in assets or in gains of services or intangibles which he [or she] in fact sought in the relevant transaction.

*Id.* (footnote omitted). If, however, the defendant's wrongdoing is intentional or substantial, or there are no other means of measuring the wrongdoer's enrichment, recovery of profits may be granted. *See generally* Palmer § 2.12 at 164–65.

**B**

■ The trial court determined that EarthInfo's breach of the Contracts was substantial, damages were difficult to assess, and the parties mutually consented to rescission.

---

10. See *Duke v. Pickett,* 168 Colo. 215, 451 P.2d 288 (1969), in which we reversed a trial court's determination that fraudulent intent was insufficient to support an order of rescission. *See also*

Restatement of Restitution §§ 65, 66 illus. 9, 157, 158 and 159; 66 Am.Jur.2d *Restitution & Implied Contracts* § 171.

Thus, the trial court required EarthInfo to disgorge all the profits it realized as a result of the breach. The court returned to Earth-Info the consideration it agreed to pay for the Hydrodata product line and also allowed it to retain the profits it earned when it was making the royalty payments. The court held EarthInfo responsible, however, for the repayment to Hydrosphere of the net profits it realized from June 30, 1990 until the date of the order, determining that to be the most equitable treatment of the parties given the nature of the dispute. We agree that Earth-Info must be required to disgorge the profits it accrued as a result of its breach since its breach was conscious and substantial.

The trial court found that the Contracts between EarthInfo and Hydrosphere did not require EarthInfo to pay royalties on sales of the derivative product. EarthInfo was still required, however, to pay royalties on all other products under the written Contracts. The trial court determined that EarthInfo's repudiation of its long-standing royalty obligations to Hydrosphere was a substantial breach of the Hydrodata Contracts. The trial court's factual determinations are supported by the evidence and should not be disturbed on appeal absent a clear showing of abuse of discretion. *See La Plata Medical Center Assoc., Ltd. v. United Bank of Durango,* 857 P.2d 410 (Colo.1993). The trial court's order represents a permissible exercise of its discretion.

Since the record supports the trial court's findings that EarthInfo consciously and substantially breached its Contracts with Hydrosphere, damages were difficult to assess, and the parties mutually agreed to rescission, retention of profits by EarthInfo would be an unjust enrichment. Accordingly, we find that the extraordinary remedy of restitution and disgorgement of profits is justified.

### III

■ The remaining issue then is the determination of the profits to be returned to Hydrosphere. The petitioner contends that the trial court erred in failing to apportion the net profits in a way that reflected the relative contributions to those profits by the parties. We agree.

"Courts have recognized that some apportionment must be made between those profits attributable to the plaintiff's property and those earned by the defendant's efforts and investment, limiting the plaintiff to the profits fairly attributable to his share." Dobbs § 4.5(3) at 642–43. "Even the wilful wrongdoer should not be made to give up that which is his [or her] own; the principle is disgorgement, not plunder." *Id.* at 642. The defendant's personal efforts in contributing to profits must be taken into account, but are often difficult to measure. For example, if the defendant uses the plaintiff's machine in producing goods, which it packages, distributes and sells to retail customers, it may increase its profits, but we are not so sure that the increase has much if any connection with the plaintiff's machine. We can be sure, however, that the defendant's profits relate in part to the defendant's own investments, efforts, or enterprising attitude. *Id.* at 647.

Dobbs' example of profit-making complexity is similar to the profit-making in the case at hand. EarthInfo used Hydrosphere's software programming in five items produced, packaged, distributed, and sold by EarthInfo. EarthInfo's marketing, packaging and enhancement of the products presumably contributed to the earning of the net profits; that contribution should be accounted for and withheld from the disgorgement of those profits by Hydrosphere.

■ No single rule governing the burden of proving apportionment is adequate for all cases or all facets of a single case. *See generally* Palmer § 2.13 at 166–75; Dobbs § 4.5(3) at 641–44. Profit claims can be calculated first by identifying and deducting legitimate business expenses from gross income. Dobbs § 4.5(3) at 641. The defendant usually has the best access to this information and may properly be required to prove such expenses. *See id.* Second, gross income of the defendant is produced at least in part "by investment, enterprise, and management skill of the defendant," and the defendant should receive credit for its own efforts and investments. *Id.* The court must determine which part of the profit results from the defendant's own independent efforts and which part results from the bene-

fits provided by the plaintiff. The court must seek to determine a fair apportionment that will result in a reasonable approximation or informed estimate of the relative contributions of the two parties. *See generally* Palmer § 2.13 at 171–73; Dobbs § 4.5(3) at 643. The allocation of the burden of establishing such approximation, and degree of specificity of proof required, may be affected by such factors as the seriousness of the defendant's wrongdoing and the extent to which the plaintiff's contribution was at risk in the profit making enterprise. *See* Palmer § 2.13 at 171–73; Dobbs § 4.5(3) at 643–44. Where the relative contributions of the two parties are inseparable or untraceable, there should be no recovery of profits by the plaintiff unless the defendant is a very serious wrongdoer. *See id.* at 644. In the present case, considering the nature and extent of the breach as well as the other relevant factors, we hold that it is the burden of the plaintiff to establish facts sufficient to permit the trial court to determine the relative contributions of the parties so that profits can be fairly apportioned.

The record in this case indicates that EarthInfo materially contributed effort and investment to the Hydrodata line of products. EarthInfo's contribution included user manuals, packaging, trademarks, promotional materials, and lists of persons or entities licensed to use the products. Thus, EarthInfo should be credited for the amount of its expenses in developing and marketing the Hydrodata product line.

The trial court made no findings with respect to the relative contributions of each party and whether they are inseparable. Thus, this case should be remanded to the trial court for further proceedings so that the court's order that EarthInfo disgorge its profits is limited to those profits attributable to Hydrosphere. Accordingly, we affirm in part, reverse in part, and return this case to the court of appeals with directions that it remand the case to the trial court for recalculation of wrongful profits attributable to Hydrosphere and entry of a new order of restitution.