**John WATSON and Local Service Corporation, Plaintiffs–Appellants,**

v.

**CAL–THREE, LLC, a Colorado limited liability company, Defendant–Appellee.**

No. 06CA1542.

Colorado Court of Appeals, Div. IV.

April 14, 2011.

Law Office of Beth L. Krulewitch, P.C., Beth L. Krulewitch, Denver, Colorado, for Plaintiffs–Appellants.

Allen & Vellone, P.C., Patrick D. Vellone, Jennifer E. Schlatter, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge CASEBOLT.

In this dispute involving a real estate development, plaintiffs, John Watson and his closely-held entity, Local Service Corporation (collectively, Watson), appeal the judgment awarding compensatory and punitive damages in favor of defendant, Cal–Three, LLC (Cal–Three), upon its counterclaims. We affirm in part, vacate in part, and remand for a new trial on damages.

This case arises from a real estate project initiated by Brandon Park, LLC (Brandon Park). In 1999, Brandon Park borrowed money from First United Bank (FUB) to develop and construct townhomes in the project. In return, FUB obtained a first deed of trust. Watson agreed to guarantee repay-

ment of the loan in exchange for a fee to be paid from the project's proceeds.

Calahan Construction Company (whose principal is Gordon Calahan) was the general contractor for the first phase of the project. When Brandon Park began having problems paying Calahan and others, Calahan initiated an action against it.

In June 2002, the parties mediated the dispute between Calahan and Brandon Park, resulting in the execution of a number of connected settlement agreements that resolved all issues. In one agreement, Brandon Park transferred all its rights in the project to Cal–Three, an entity formed by Gordon Calahan for the express purpose of becoming the owner and developer of the project.

Watson was not a party to that lawsuit but attended the mediation, was heavily involved in the negotiations and subsequent preparation of the modification and settlement agreements, and agreed to accept a reduced guarantor fee from the project. The agreements established a new fee due to Watson and a repayment plan for FUB and all other creditors, to be funded by the sale of completed townhomes.

In August 2002, Watson sent a notice to Cal–Three asserting that it was in default of the new agreements for failing to pay the outstanding balance on the FUB loan, failing to pay real estate taxes and homeowners association dues, failing to cure and resolve mechanics' liens, failing to obtain a construction loan, and failing to preserve and maintain the premises. Cal–Three did not respond to this notice.

On or about October 24, 2002, a sale of a completed townhome was scheduled to close. Watson sent a payoff letter to the title company in connection with the closing. Because the title company had asked Watson for the payoff amount for that one unit but Watson responded with a payoff amount for the entire project, the closing did not occur.

One day later, Watson commenced this action seeking a receiver, and one was appointed. In December 2002, having paid the remaining balance owed to FUB, Watson filed an action pursuant to C.R.C.P. 120 to foreclose the deed of trust. Cal–Three did not appear in the C.R.C.P. 120 action.

At the foreclosure sale in February 2003, Watson successfully bid on the property. The redemption period expired, and title to the property was transferred to Watson, who sold the remaining three completed townhome units in the project for $414,326.55 and the remaining raw land for $783,000.

Cal–Three eventually filed an answer and counterclaims in this, the receivership action, including claims for tortious interference with contract, breach of contract, and breach of the covenant of good faith and fair dealing. Watson responded to the counterclaims and included an affirmative defense of failure to mitigate damages.

Following a bench trial, the court ruled in favor of Cal–Three on its breach of contract and covenant of good faith claims. The court concluded that Cal–Three had not been in default on any obligation when Watson had sent the August 2002 letter. The court found that Cal–Three had been damaged in the amount of the profits realized by Watson—$414,326.55 resulting from the sales of the three existing townhomes, and $783,000 resulting from Watson's sale of the remaining raw land. The trial court also awarded Cal–Three $50,000 in punitive damages for what it found to be Watson's willful and wanton behavior.

After this appeal was filed and at issue, Watson and Local Service Corporation filed petitions in bankruptcy. Approximately three years later, the parties jointly petitioned for relief from the automatic stay, which the bankruptcy court granted.

I.

Watson asserts that the failure of the trial judge sua sponte to disqualify herself before entering judgment requires reversal. Specifically, Watson asserts that the trial judge should have recused herself because, before entering judgment, she sent a letter of complaint concerning Watson, an inactive attorney, to the Colorado Supreme Court Office of Attorney Regulation Counsel. Under the circumstances present here, we disagree.

■ The trial court's determination on a motion for disqualification is discretionary and will not be reversed absent an abuse of discretion. *Spring Creek Ranchers Ass'n v. McNichols,* 165 P.3d 244, 245 (Colo.2007). An abuse of discretion occurs only when the trial court's decision is manifestly arbitrary, unreasonable, or unfair. *First Horizon Merchant Services, Inc. v. Wellspring Capital Management, LLC,* 166 P.3d 166, 179 (Colo. App.2007).

A judge must be free of all taint of bias and partiality. *People v. Dist. Court,* 192 Colo. 503, 507, 560 P.2d 828, 831 (1977). To this end, under the Colorado Code of Judicial Conduct in effect at the time of trial, a judge should disqualify himself or herself whenever the judge's impartiality might reasonably be questioned. C.J.C. 3(C)(1).

■ What a judge learns in his or her judicial capacity is a proper basis for judicial observation, and the use of such information does not require disqualification. *Smith v. Dist. Court,* 629 P.2d 1055, 1056 (Colo.1981). Thus, a judge is not recusable for bias or prejudice that is based on the facts and circumstances of the case, even where, upon completion of the evidence, the court is exceedingly ill disposed toward a party. *Liteky v. United States,* 510 U.S. 540, 550–51, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Even an opinion as to the guilt or innocence of a criminal defendant is generally not a basis for disqualification. *Walker v. People,* 126 Colo. 135, 145, 248 P.2d 287, 293 (1952). "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he [or she] could never render decisions." *In re J.P. Linahan, Inc.,* 138 F.2d 650, 654 (2d Cir.1943).

C.R.C.P. 251.4 states that "[a] judge has a duty to report unprofessional conduct by an attorney to Regulation Counsel pursuant to Canon 3(B)(3) of the Colorado Code of Judicial Conduct." Canon 3(B)(3), as in effect at the time of trial, required a judge to "take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware."

■ Here, the trial court entered a sequestration order for all witnesses at the beginning of trial. During trial, it came to the court's attention, and the court found, that Watson had violated the order by sending a facsimile recounting trial testimony to a witness who was scheduled to, and did, testify.

After the court took the case under advisement following completion of the trial, but several days before issuing findings of fact and conclusions of law, the trial judge reported what she believed to be Watson's unethical conduct to the Office of Attorney Regulation Counsel. Several months after the final judgment was issued in this case, Watson received a letter from Regulation Counsel informing him that the trial judge had reported his behavior "in accordance with her duty under C.R.C.P. 251.4" and that his conduct was under investigation.

While the better practice would have been for the court either to inform Watson of her report before entering judgment or wait to report any unethical behavior until after entry of judgment, we nevertheless do not perceive that disqualification before entering judgment was required under these circumstances. Despite the fact that Watson's license to practice law was suspended in 1994 and never reinstated, he remained subject to the Rules of Professional Conduct. *People v. Jamrozek,* 921 P.2d 725, 726 (Colo.1996). In reporting what she believed to be unprofessional conduct by Watson, the judge acted in accordance with her duties.

■ Moreover, even assuming that Watson's violation of the sequestration order resulted in "prejudice" against him on the part of the trial judge—a finding that we do not make here—the trial judge would have acquired any such "prejudice" from the circumstances of the case and the facts she learned during the proceedings. Therefore, any "prejudice" on her part would not constitute an improper prejudgment of the case of the type requiring recusal. *See Liteky,* 510 U.S. at 550–51, 114 S.Ct. 1147; *Smith,* 629 P.2d at 1056.

Watson asserts that, in response to a motion he filed after the judgment was entered and based on the report to Attorney Regulation Counsel, the trial judge recused herself. However, that recusal does not, in our view, require a different result in this appeal.

■ The critical inquiry is whether the trial judge was required to recuse before entering the judgment, and her determination to actually recuse several months after judgment, without providing any explanation and when only attorney fees remained to be resolved, does not speak to that issue. Recusal provides prospective relief; it does not necessarily invalidate orders previously entered. *See People v. Schupper*, 124 P.3d 856, 859 (Colo.App.2005)(in determining whether to retroactively apply a trial judge's recusal order, the first question is whether the judge erred in failing to earlier recuse himself or herself), *aff'd*, 157 P.3d 516 (Colo.2007).

Indeed, Watson has cited no authority for the contention that the trial judge's later recusal requires vacation of the judge's prior findings of fact and conclusions of law. The law appears to be to the contrary. *See, e.g., Beer v. Griffith*, 54 Ohio St.2d 440, 442, 377 N.E.2d 775, 776 (1978)(although a judge would be without power to hear and determine a matter after disqualification, his or her judgment before disqualification is not void).

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), on which Watson relies, does not require a different result here. There, the Supreme Court held that, when a trial judge should have been disqualified because of a financial interest that predated the judgment, a motion for relief from the judgment under Fed.R.Civ.P. 60 was properly granted and a new trial was required. Here, in contrast, we have concluded that the trial judge need not have disqualified herself before entering judgment.

Watson's reliance upon *Wright v. District Court*, 731 P.2d 661 (Colo.1987), for a different result is also misplaced. In that case, Judge Thomas Goldsmith filed a grievance and recommended "harsh discipline" against attorney Russell, who the judge perceived had committed malpractice and misconduct in representing a client in a matter before him (first case). Subsequently, a different client filed a malpractice claim (second case) against Russell's law firm, and the case was assigned to Judge Goldsmith, who refused to recuse himself and denied a motion for disqualification.

On review, the supreme court held that Judge Goldsmith should have recused himself in the second case because his "view of the propriety of Russell's conduct [in the first case] may influence him in considering the malpractice claim against [Russell's partner] and the firm" in the second case. *Wright*, 731 P.2d at 663.

We do not read *Wright* to mandate disqualification here. There, the court did not hold that Judge Goldsmith should have disqualified himself from the *first case*, which would be the analog to Watson's argument here. Instead, the court held that recusal was required in the *second case*, which was ongoing and could have overlapped disciplinary proceedings against Russell. Here, there is no such second case, and the judgment was entered well before the judge would have had to testify in any grievance proceeding.

Watson nevertheless points to the *Wright* court's statement that "[t]he appearance of impropriety that would arise from Judge Goldsmith appearing as a witness before the grievance committee to support his complaint that he said required 'harsh discipline' while sitting as a trial judge on a case charging the same firm with malpractice is apparent." *Id.* at 664. Contrary to Watson's contention, we do not perceive that statement to require that any time a judge files a grievance against a firm and thus becomes a potential witness, recusal in that same case is required. Again, the law appears to be to the contrary.

In *5-H Corp. v. Padovano*, 708 So.2d 244, 248 (Fla.1997), the court held that a "judge's mere reporting of perceived attorney unprofessionalism to [t]he Florida Bar, in and of itself, is legally insufficient to support judicial disqualification" under the Code of Judicial Conduct provision mandating disqualification in a proceeding when a judge's impartiality

might be questioned. *See also Joyner v. Comm'r*, 55 Conn.App. 602, 613, 740 A.2d 424, 430 (1999); *State v. Mata*, 71 Haw. 319, 324–25, 789 P.2d 1122, 1125–26 (1990); *Blacknell v. State*, 502 N.E.2d 899, 904 (Ind. 1987).

Other authorities also support this view. *See* Leslie W. Abramson, *Appearance of Impropriety: Deciding When a Judge's Impartiality "Might Reasonably be Questioned,"* 14 Geo. J. Legal Ethics 55, 86 (2000) ("a judge's report of perceived attorney misconduct also is insufficient to constitute an appearance of partiality so that the judge must be disqualified in any proceeding where the attorney is counsel of record"); Utah State Courts Informal Op. 05–2 (Nov. 22, 2005) (a perception of bias is not automatically created when a judge refers an attorney to the Office of Professional Conduct), *available at* www.utcourts.gov/resources/ethadv/ethics_opinions/2005/05–2.htm.

Our resolution also necessarily rejects Watson's additional contention that reversal is required under the then applicable version of C.J.C. 3(D) because the trial judge had the affirmative duty to advise him immediately of the complaint she had made to Attorney Regulation Counsel.

Under that provision, a judge who was or might be subject to disqualification by the terms of then applicable Canon 3(C) could, instead of withdrawing from the proceeding, disclose on the record the basis of the judge's possible disqualification, and the parties could nevertheless consent to the judge's continued participation in the matter. Because we have concluded that the trial judge was not disqualified by the terms of Canon 3(C), Canon 3(D) does not apply here.

We therefore reject Watson's contention that the trial judge should have recused herself before entering judgment, and, therefore, we decline to disturb the judgment on this basis.

## II.

Watson asserts that the trial court's compensatory damages award must be vacated because it is premised upon an erroneous measure of damages and is not supported by the evidence. We agree that the damages award cannot stand.

■ In a breach of contract action, a plaintiff generally may recover the amount of damages that is required to place him in the same position he would have occupied had the breach not occurred. *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993). This amount is commonly called the "expectancy" interest. *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000) (contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining).

■ The expectancy interest may include past lost profits. *Colo. Nat'l Bank v. Friedman*, 846 P.2d 159, 174 (Colo.1993). As the court explained in *Boyle v. Bay*, 81 Colo. 125, 254 P. 156 (1927):

[With respect to lost profits] it is . . . well settled that the profits which would have been realized had [a] contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into.

81 Colo. at 130–31, 254 P. at 158–59 (quoting *Anvil Mining Co. v. Humble*, 153 U.S. 540, 549, 14 S.Ct. 876, 38 L.Ed. 814 (1894)).

■ Future lost profits, or those that a party would have made if it had been allowed to complete work under a contract, are also recoverable. *Belfor USA Group, Inc. v. Rocky Mountain Caulking & Waterproofing, LLC*, 159 P.3d 672, 677 (Colo.App.2006).

The expectancy interest is not the only interest that is protectable by an award of damages in a breach of contract case. While generally a mere breach of contract will not make a defendant liable for return of the profits it achieves as a consequence of

breach, under some circumstances, a party to a contract may recover profits obtained by the breaching party under a remedy of disgorgement. *EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc.,* 900 P.2d 113, 118–19 (Colo.1995).

In *EarthInfo,* the parties had entered into contracts to develop a number of products to exploit information collected by governmental agencies. The contracts provided for payment of fixed fees as well as royalties. A dispute developed concerning whether certain new derivative products were subject to royalty payments. In the subsequent litigation, the trial court determined that EarthInfo had breached its contracts when it unilaterally suspended royalty payments. In a later damages hearing, both parties sought rescission of the contracts and restitution as a remedy. The trial court found that the breach was substantial, that damages would be inadequate, and that rescission was appropriate. It ordered EarthInfo to pay the net profits it had realized from the date it stopped making royalty payments until the rescission date.

On appeal, the supreme court phrased the issue as whether a party that breaches a contract can be required to disgorge to the nonbreaching party any benefits received as a result of the breach. The court explored the subtle conflict between the law of restitution and the law of contracts and, rather than announcing a general rule, held that whether the breaching party's profits can be awarded to a nonbreaching party must be determined on a case-by-case basis, a determination within the discretion of the trial court. If the breaching party's wrongdoing is intentional or substantial, or there are no other means of measuring the wrongdoer's enrichment, recovery of the breaching party's profits may be granted. *Id.* at 119. The court stated:

> [T]he [trial] court must resort to general considerations of fairness, taking into account the nature of the defendant's wrong, the relative extent of his or her contribution, and the feasibility of separating this from the contribution traceable to the plaintiff's interest. Thus, the more culpable the defendant's behavior, and the more

direct the connection between the profits and the wrongdoing, the more likely that the plaintiff can recover all defendant's profits. The trial court must ultimately decide whether the whole circumstances of a case point to the conclusion that the defendant's retention of any profit is unjust.

*Id.* (citations omitted).

Accordingly, we reject Watson's contention that an award of Cal–Three's lost profits is the only measure of damages available here.

Further, contrary to Watson's argument, we do not perceive that disgorgement of profits is available only when rescission of a contract is sought and obtained. While those were the factual circumstances in *EarthInfo,* the court did not limit its holding only to cases in which rescission is sought. Indeed, Restatement (Third) of Restitution § 39(1) (Tentative Draft No. 4, 2005), which appears to formulate a general rule in synthesizing breach of contract cases allowing recovery of a defendant's profits, notes that liability in restitution with disgorgement of profits is an alternative to liability for contract damages measured by injury to the promisee. *See* Melvin A. Eisenberg, *The Disgorgement Interest in Contract Law,* 105 Mich. L.Rev. 559 (2006); John D. McCamus, *Disgorgement for Breach of Contract: A Comparative Perspective,* 36 Loy. L.A. L.Rev. 943 (2003).

■ Accordingly, the trial court did not err in employing the disgorgement of net profits remedy.

Here, the court concluded that Watson had entered into the settlement agreements in bad faith and that he had also exercised bad faith in responding to the townhome closing payoff request with a payoff for the entire project rather than the smaller amount agreed to in the settlement agreements. The court also concluded that Watson had acted deliberately in breaching the contracts and found that he had acted willfully and wantonly. The record supports the trial court's findings.

Watson testified that he provided the figure in the payoff letter, which ultimately led to Cal–Three's inability to sell the remaining units, because he believed the title company

was requesting a payoff amount for the entire project as opposed to one unit. However, the letter indicated that the payoff was referring to the specific unit, not the entire project. The trial court found that Watson's testimony was not credible and that his payoff letter was sent in bad faith.

Watson asserted that Cal–Three breached its agreement by failing to pay the FUB loan, thus requiring that he pay it. The trial court held that no documentation supported this allegation and found Watson's testimony not credible and his position not defensible. Indeed, the settlement agreements provided for the payment of the FUB loan from the proceeds of the townhome sales.

Watson asserted that Cal–Three had failed to obtain a construction loan within the time allegedly required by the agreements. The trial court found that no deadline had been set in the agreements for obtaining the loan and that the failure to obtain a loan was due to the actions of Watson, not Cal–Three.

Watson testified that Cal–Three failed to pay real estate taxes on the project. The trial court found that there was no indication of delinquent taxes on the property and that the evidence available suggested Cal–Three had been paying taxes as required.

Watson testified that Cal–Three had failed to resolve numerous mechanics' liens. The trial court noted that no testimony or evidence was offered to support this position and the available evidence suggested the subcontractors were being paid pursuant to the escrow settlement agreement.

Watson testified that Cal–Three had failed to maintain the premises, make payments to the homeowners association, and pay utility bills. Again, the trial court found that Watson failed to provide any documentation in support of these allegations.

In our view, the trial court's findings are sufficient under *EarthInfo* to justify its exercise of discretion to order disgorgement of Watson's profits. The question remains, however, whether the trial court correctly determined Watson's profits. We conclude it did not do so.

Here, the trial court found that Watson's profit on the sale of the three units was $414,326.55 and that Watson sold the remaining raw land for $783,000. As a result, the court found Watson received profits of $1,197,326.55, and the court determined to award Cal–Three that sum as damages.

However, it was undisputed at trial that Watson had paid the FUB loan in full. It was likewise undisputed that the outstanding balance was $66,366.80 when he paid it, and that Cal–Three was liable for that sum. But the trial court did not subtract or otherwise account for this amount in its award.

In addition, the court did not undertake to apportion the profits attributable to the benefits produced by Cal–Three and those earned by Watson's efforts and investment. *See EarthInfo,* 900 P.2d at 120–21 (requiring trial court to take into account defendant's personal effort in contributing to profits). While the burden of proving expenses to be deducted from gross profits generally will fall to the defendant, *id.,* and the trial court found here that Watson had testified about expenses but had not provided documentation for them, we are loath to hold Watson fully accountable for failing to produce such evidence because Cal–Three requested damages in large part based upon a recovery of its lost profits, not a restitutionary recovery of Watson's profits. The vast majority of Gordon Calahan's damages testimony concerned Cal–Three's anticipated gross income and expenses, and he only fleetingly mentioned Watson's gross profits. Under these circumstances, we cannot conclude that Watson has failed to satisfy his burden to prove expenses.

Because the trial court made no findings with respect to the relative contributions of each party, or whether they are inseparable, we must remand the damages determination to the trial court. *See EarthInfo,* 900 P.2d at 121. In light of the fact that the trial judge has recused herself, we conclude the proper remand is for a new trial on damages before a different judge. And because the decision to award disgorgement of profits as a remedy for breach of contract is a discretionary determination, we also conclude that Cal–Three should again be permitted to present evidence on its lost profits so that the court

can determine whether to award its lost profits or order disgorgement of Watson's net profits. The court may also consider the factors set forth in Restatement (Third) of Restitution § 39 in reaching its conclusion.

## III.

Because it may arise on remand, we next address Watson's contention that the trial court erred by failing to consider the affirmative defense of failure to mitigate damages. We agree.

C.R.C.P. 8(c) entitles a party to have an affirmative defense considered by the trier of fact so long as it has been properly pleaded, evidence is presented at trial to support its consideration, and the party asserting it brings it to the court's attention. *See Minto v. Lambert*, 870 P.2d 572, 575 (Colo.App. 1993).

Here, Watson listed the affirmative defense of failure to mitigate damages in his answer to Cal–Three's counterclaims, presented evidence concerning Cal–Three's failure to respond to the August 2002 letter and its failure to oppose the receivership or the foreclosure, and discussed the issue in both opening statement and closing argument. The trial court did not address the defense. Accordingly, the court erred in failing to consider it. On remand, if Watson again asserts the defense and provides evidence to support it, the trial court should make findings of fact and conclusions of law concerning it.

## IV.

Watson asserts that the award of punitive damages must be vacated because exemplary damages are not available for a breach of contract and the award is not supported by the evidence. We agree that the award cannot stand.

 Present case law in Colorado does not recognize a claim for punitive damages predicated upon breach of contract. *Mortgage Finance, Inc. v. Podleski*, 742 P.2d 900, 903 (Colo.1987); *William H. White Co. v. B & A Mfg. Co.*, 794 P.2d 1099, 1101 (Colo.App. 1990). The rule is the same for breach of the covenant of good faith and fair dealing.

*Decker v. Browning–Ferris Indus., Inc.*, 947 P.2d 937, 940 (Colo.1997).

Here, although Cal–Three pleaded a claim for tortious interference with contract, the trial court found for Cal–Three only on its breach of contract and breach of the covenant of good faith and fair dealing claims. Without a successful claim for tortious conduct, the punitive damages award cannot stand. *Mortgage Finance*, 742 P.2d at 903.

We reject Cal–Three's assertion that the trial court's finding that Watson violated the sequestration order allows an award of exemplary damages. Cal–Three has provided no authority, and our own research has disclosed none, to support the assertion.

Accordingly, we vacate the punitive damages award.

## V.

Cal–Three asserts that it is entitled to attorney fees and costs on appeal. We disagree.

 When a party is awarded attorney fees for a prior stage of the proceedings under fee-shifting provisions, it may recover reasonable attorney fees and costs for successfully defending the appeal. *Levy–Wegrzyn v. Ediger*, 899 P.2d 230, 233 (Colo.App. 1994).

Here, however, there has been no award of attorney fees to Cal–Three. The trial court indicated that Cal–Three could submit a motion, but the record does not contain such a motion or an order awarding fees. Because an award of attorney fees has not yet been made, we have no basis for awarding attorney fees on appeal.

That part of the judgment finding Watson liable for breach of contract is affirmed. That part of the judgment awarding damages is vacated, and the case is remanded for a new trial on damages consistent with the views expressed in this opinion.

Judge WEBB and Judge TERRY concur.